IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Michael Gregg-Wilson, | ) Civil Action No. 3:04-23132-MBS-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| John Roveri, Director Sumter County Career | ) |
| Center (SCCC); Stuart A. Liddell, A.D. SCCC; | ) |
| Elmer Edwin Jackson, Machine Tool Instructor | ) |
| SCCC; Larry Culick, Welding Instructor SCCC; | ) |
| William Dyson, Building Construction Instructor | ) |
| SCCC; Charles J. Boykin, Attorney Duff, Turner, | ) |
| White & Boykin, L.L.C.; Jo R. White, | ) |
| Chairperson SCCC Board of Trustees; Zona | ) |
| Jefferson, board member; Wesley Blanding, board | ) |
| member; Charles Burns, board member; Tom | ) |
| Garrity, board member; James Griffin, board | ) |
| member; Kay Raffield, board member; Kurt | ) **REPORT AND RECOMMENDATION** |
| Welday, board member, | ) |
| | ) |
| Defendants. | ) |
| | ) |

The pro se plaintiff, Michael Gregg-Wilson ("Gregg-Wilson"), brought this action after

he was terminated from his position as a computer instructor at the Sumter County Career Center

("SCCC").  The defendants are John Roveri ("Roveri"), Director of SCCC; Stuart Liddell

("Liddell"), Assistant Director of SCCC; three of the school's instructors, Elmer Edwin Jackson

("Jackson"), Larry Culick ("Culick"), and William Dyson ("Dyson"); the members of SCCC's

Board of Trustees (collectively "the Board"), Zona Jefferson ("Jefferson"), Edward Alston

("Alton"), Frank Baker ("Baker"), Wesley Blanding ("Blanding"), Charles Burns ("Burns"), Tom

Garrity ("Garrity"), James Griffin ("Griffin"), Kay Raffield ("Raffield"), Kurt Welday ("Welday"); and Charles J. Boykin ("Boykin"), a private attorney for the Board.[1]

The Complaint is a thirty-one page narrative of events that occurred during the last half of 2004 leading to Gregg-Wilson's termination. Gregg-Wilson does not label specific claims, but states that his action is brought pursuant to 42 U.S.C. §§ 1981, 1983 and 1985 (3).[2] (Complaint, pp.1-2).

Defendants have responded to the Complaint in different fashions. Boykin filed a motion to dismiss on January 3, 2005. (Doc. No. 4). An order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) was issued on January 7, 2005. Gregg-Wilson filed a response and motion for sanctions against Boykin on January 11, 2005 (Doc. No. 9). The members of the Board, Jackson, Culick, and Dyson filed a motion to dismiss on January 26, 2005 (Doc. No. 12). A second Roseboro order was issued on January 31, 2005. Gregg-Wilson did not file a response to this motion to dismiss. Roveri and Liddell filed an Answer on January 26, 2005 (Doc. No. 11) and a motion for summary judgment on June 13, 2005 (Doc. No. 38). Before a Roseboro order was issued with respect to this motion,[3] Gregg-Wilson filed a "Counter-Motion for Default and Summary Judgment with Memorandum of Irrefutable Law, Facts and Documents in Support. (Doc. No. 39). All defendants filed a response on July 18, 2005. (Doc. No. 42). In addition to

---

[1]It is noted that Gregg-Wilson has not specified whether these defendants are sued in their individual or official capacities. Therefore, the undersigned must assume they are sued in both capacities. It is also noted that Gregg-Wilson has not sued SCCC or any public entity connected with SCCC.

[2]Pretrial matters in this case were assigned to the undersigned pursuant to Local Rule 73.02(b)(2)(d) and (e).

[3]The Roseboro order was issued on July 5, 2005.

the "Counter-Motion" (Doc. No. 39), Gregg-Wilson filed a "Motion for Summary Judgment Against Defendants Roveri, Liddell, Jackson, Culick, and Dyson with Memorandum and Documents in Support" (Doc. No. 10) on January 11, 2005, and a Motion for Judgment on Partial Findings or Judgment as a Matter of Law, with Memorandum of Law, Facts and Documents in Support (Doc. No. 43) on August 2, 2005.

Review of the record in this case shows that it is poorly developed. As mentioned above, Gregg-Wilson does not specifically list his claims in the Complaint. The motions and memoranda of the parties do little to define Gregg-Wilson's claims. Further, little discovery has been conducted to develop the facts supporting Gregg-Wilson's claims. It appears that Gregg-Wilson did not serve any discovery requests on defendants. Defendants served interrogatories and a request for document production on Gregg-Wilson, but he did not respond. Defendants' motion to compel was granted, and Gregg-Wilson was ordered to respond. Gregg-Wilson did not comply with the order. Further, Gregg-Wilson did not appear for his deposition. (See discussion below). Further complicating analysis of this record is the procedural posture outlined above. All defendants are represented by the firm of Duff, White & Boykin. Defendant Boykin is a member of the firm. They have chosen to submit motions to dismiss for some defendants and a motion for summary judgment as to others.

## Facts

The undersigned has gleaned the following facts from the allegations in the Complaint and the documents submitted with the parties memoranda:[4]

---

[4]Gregg-Wilson attached a number of documents to his motion for summary judgment filed January 11, 2005. ("Pl. Mot., Ex. __"). Roveri and Liddell also attached documents to their
(continued...)

3

1.    Gregg-Wilson is an Africa-American.

2.    SCCC "serves students from Sumter School Districts Two and Seventeen and is governed

      jointly by both school districts." (Doc. No. 13, p. 2).

3.    Gregg-Wilson began working as an instructor at SCCC in October of 2002.

4.    In April of 2004, Roveri's predecessor gave Gregg-Wilson a one-year provisional contract

      for the 2004-2005 academic year (Def. Mem., Ex. 1).

5.    Roveri, a Caucasian, was hired by the Board in the summer of 2004 (Complaint, p. 5).

---

[4](...continued)
memorandum in support of their motion for summary judgment ("Def. Mot., Ex. __"). All of
these documents have been considered in preparation of this Report and Recommendation. On
May 9, 2005, Gregg-Wilson filed "Answers to Local Rule 26.03 Interrogatories." (Doc. No. 36).
However, this document provides no answers to any interrogatory. Instead, Gregg-Wilson
submitted two "DVD-R" which appear to be compact discs (CD's). Also with his "Counter-
Motion" (Doc. No. 39), Gregg-Wilson submitted two more CD's which he described as follows:

> In response to such blatant egregious lies, Plaintiff has included with this motion
> an eight page table of contents listing all files contained on the CD-R previously
> submitted to the Court and Counsels for Defendants on May 9, 2005. In addition
> a DVD+R containing motion and still video from historical public broadcasts, and
> personal/private sources, audio recordings from local magistrate courts, meetings
> with Charles J. Boykin, John Roveri, Stuart A. Liddell, South Carolina
> Employment Commission Appeals Hearing and messages to telephone answering
> machines. Also included are numerous research documents, historical to current,
> personal drafts and finished documents and various other evidence too numerous
> to list. Also included is a copy of a sworn affidavit submitted to the local Police
> and Sheriff's Department as well as the Sumter Daily Item.

With the help of the Court's computer systems personnel, the undersigned attempted to survey the
documents submitted by Gregg-Wilson on CD. Some contained no readable documents while
others contained thousands of documents. It is plaintiff's responsibility to submit memoranda
with supporting exhibits referenced in the memoranda. Gregg-Wilson has not done this. The
undersigned declines Gregg-Wilson's invitation to search through these documents to determine
which of them might support his unspecified claims. The information contained on the CD's has
not been considered in preparation of this Report and Recommendation. However, the
undersigned has considered a letter from Gregg-Wilson to the Sumter Chief of Police, a second
letter to the Chief of Police and the Sheriff of Sumter County, and Gregg-Wilson's unsigned
affidavit attached to his "Counter-Motion."

4

6.    Roveri convened a five person in-house committee (including himself) to screen five applicants for the position of Assistant Director. (Id.)

7.    Gregg-Wilson applied. (Id.)

8.    Liddell, a Caucasian, was selected and hired for the position. (Id.)

9.    On July 27, 2004, Gregg-Wilson wrote a letter to the Board expressing his view that minorities were not given proper consideration for the positions filled by Roveri and Liddell and that racial discrimination had influenced their hiring to the detriment of himself and other minorities.[5]

10.   On August 12, 2004, Roveri held a staff meeting in connection with the beginning of the academic year. Roveri stated that "faculty meetings would not be used for discussing, debating, complaining, arguing or otherwise creating contention among staff over issues of public, private, legal or constitutional concerns." (Complaint, ¶ 19). Roveri also announced a dress code for instructors which included that male instructors wear neck ties (Id.). Gregg-Wilson challenged Roveri on both issues. Id.

11.   At a staff meeting held September 1, 2004, Gregg-Wilson "made derogatory accusations about the administration, including disruptive outbursts and maligning of various [SCCC's] employee administrators, creating dissension among the staff." (Def. Mem., p. 3).[6]

_____

[5]This letter is quoted verbatim in the Complaint at pages 4-6.

[6]Gregg-Wilson does not deny that he was disruptive during the meeting. Indeed, in a letter to Roveri and Liddell dated September 8, 2004, Gregg-Wilson stated that he decided to use the meeting to take action "to rein you two (i.e., Roveri and Liddell) in" due to their "abuse of power and authority." (Complaint, p. 13, Def. Mem., Ex. 3).

12.    Roveri wrote Gregg-Wilson a letter on September 2, 2004, suspending him for "gross misconduct during our faculty meeting."  The letter also criticized Gregg-Wilson for leaving his students unsupervised and wasting instructional time. (Def. Mem., Ex. 2).

13.    Gregg-Wilson responded by letter dated September 8, 2004.  Gregg-Wilson accused Roveri and Liddell of (1) "hostile animus" toward him; (2) displaying "depravity and in humanistic distain [sic]" for him; (3) "increasing bizarre behavior"; (4) "becoming totalitarian dictators, Virtual Saddam and Uday Hussein's [sic]"; and (5) "openly displaying an abuse of power and authority." (Complaint, pp. 12-13, Def. Mem., Ex. 3).

14.    On September 10, 2004, the locks to "computer/network and communications closets" were changed to deny Gregg-Wilson access.  Gregg-Wilson was directed to return certain computer parts to Roveri and Liddell. (Complaint, ¶ 27).

15.    On September 14, 2004, Gregg-Wilson (and other staff) received a letter from Liddell requiring them to "enforce a verbal only Student Dress Code policy."  Gregg-Wilson told Liddell that the letter constituted harassment. (Complaint. ¶ 28).

16.    On September 14, 2004, Gregg-Wilson attended a meeting of the Board and "attempted to present numerous violations of policy, constitutional law, and civil rights being perpetrated by … Roveri and Liddell." (Complaint, ¶ 29).

17.    On September 16, 2004, Liddell wrote Gregg-Wilson telling him that his duties no longer included computer repair and reminding him that he could not work on faculty or staff computers. (Def. Mem., Ex. 5, Complaint, ¶ 32).

18.   Gregg-Wilson received a letter from the Board on September 18, 2004, informing him that the Board had decided to conduct an "external investigation" into the allegations made at the September 14 Board meeting. (Complaint, ¶ 33).

19.   The Board chose Boykin to conduct the investigation.  Gregg-Wilson met with him on October 6, 2004, but declined to be interviewed. (Complaint, ¶¶'s 35-38).

20.   On October 12, 2004, Gregg-Wilson confronted Liddell about disparity in enforcing the student dress code policy.

21.   On October 14, 2004, Roveri called Gregg-Wilson to his office and notified him that he was being placed on administrative leave. (Complaint, ¶ 43, Def. Mem., Ex. 6).

22.   Gregg-Wilson filed a report with the Sumter Police Department stating that he felt threatened by the words and body language of Roveri and Liddell during the meeting and that they had held him against his will. (Pl. Mem., Ex. 2).

23.   On October 15, 2004, Gregg-Wilson confronted Jackson, Culick, and Dyson at an off-campus fast food restaurant and photographed them apparently to show that they were violating the dress code policy by not wearing neck ties.  Jackson allegedly assaulted Gregg-Wilson and the police were called (Complaint, p. 24; Pl. Mem. Exs. 1 and 3).

24.   On October 18, 2004, Roveri wrote Gregg-Wilson informing him that he was suspended without pay and that he (Roveri) was recommending to the Board that he be terminated. The letter stated:

> Your continuous willful gross misconduct in the workplace has continued despite repeated documented warnings one of which resulted in a suspension.  Your efforts involving students, parents and faculty members with your personal agenda is unprofessional and can no longer continue. I have included a limited example of the actions on your part.

- False information given to students about internal affairs of the Career Center
- Statements made to parents telling them not to send their child to the Center
- Misconduct in faculty meetings involving your personal agenda
- Failure to turn in a single lesson plan or pacing guide to date
- Photographing students and teachers around campus without permission
- Removing computer components from brand new office computers without permission
- Provoking staff members while at lunch in a public restaurant

(Pl. Mem., Ex. 8; Def. Mem., Ex. 6).

25.   On October 20, 2004, Gregg-Wilson wrote the Sumter Police Chief recounting his recent difficulties and criticizing the Sumter Police for failing to gather evidence from the crime scene (the restaurant where he was assaulted). (Complaint, p. 26).

26.   Gregg-Wilson was quoted in the local press on October 24, 2004, discussing his supervision, the assault, and discrimination. (Pl. Mem., Ex. 10).

27.   On November 9, 2004, Roveri wrote Gregg-Wilson informing him that he had been terminated.  The letter also advised him that he could request a hearing before the board (Def. Mem., Ex. 7).  No hearing was requested. (Def. Mem., Ex. 8, p. 68).

28.   Gregg-Wilson filed for unemployment benefits through the South Carolina Employment Security Commission.  A hearing was held on January 25, 2005, at which Gregg-Wilson appeared and testified. (Def. Mem., Ex. 8).

29.   Gregg-Wilson was awarded benefits. (Pl. Mem., Ex. 9).

## Discussion

I.     Motion for Summary Judgment of Roveri and Liddell (Doc. No. 38).

Roveri and Liddell argue that they are entitled to summary judgment because Gregg-Wilson has not established a prima facie case of disparate treatment, his conspiracy claim fails due to the intra-corporate conspiracy doctrine, he has not shown a constitutional violation, and he has failed to properly prosecute this action.  Gregg-Wilson does not address the legal arguments, but instead asserts that the defendants are lying racists ("Defendants defense was gestated in the stygian depth of fear, hatred and racism, their motion is naught but a cry for help from those who share their insane idealizations, hatred, racism, and severe lack of moral integrity"). (Doc. 39, Pl. "Counter Motion," pp. 3-4).

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  Id.  Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

9

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

A.    Disparate Treatment

As noted above, Gregg-Wilson's claims are ill-defined and the record poorly developed. Roveri and Liddell generally argue that Gregg-Wilson has no direct evidence of racial animus and that he cannot establish a prima facie case of disparate treatment because he has not identified a similarly situated white employee who was treated more favorably. (Def. Mem., pp. 10-12). These defendants employ the concepts of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1983), but cite only a District Court case from the Western District of North Carolina for a § 1981 framework. In effect, Roveri and Liddell attempt to put a round peg in a square hole.

The two most obvious disparate treatment claims raised by Gregg-Wilson's complaint are that defendants failed to promote him to Assistant Director and terminated him because of his race. Roveri and Liddell make no attempt to address these claims.

Disparate treatment claims may be brought pursuant to Title VII, § 1983, or, in the case of public employees, under § 1983. Although there are differences depending on the statute utilized, the proof schemes are the same, and Title VII principles apply under both §§ 1981 and 1983. <u>Holder v. City of Raleigh</u>, 867 F.2d 823 (4th Cir. 1989). In a disparate treatment case the plaintiff must prove that "but for" her race, she would not have been subjected to an adverse employment action. <u>Holmes v. Bevilacqua</u>, 794 F.2d 142 (4th Cir. 1986). A plaintiff can prove defendant's motive to discriminate by two methods. First, the "plaintiff may meet this burden under the ordinary standards of proof by direct[7] and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Dep't of</u>

---

[7]Plaintiff has presented no direct evidence of discrimination.

11

<u>Community Affairs v. Burdine</u>, 450 U.S. 248 (1981)." <u>EEOC v. Clay Printing Company</u>, 955 F.2d 936 (4th Cir. 1992).

In order to establish his prima facie case under the <u>McDonnell Douglas</u> scheme, the plaintiff must show that:

 (1) he is a member of a protected class;

 (2) he was qualified for his job and his job performance was satisfactory;

 (3) he was subjected to an adverse employment action; and

 (4) other employees who are not members of the protected class were

   treated more favorably.

Due to the seemingly endless ways disparate treatment claims arise, variations of the above framework have been developed by the courts. In order to establish a prima facie case of discriminatory failure to hire or promote, plaintiff is required to prove that:

 (1) he is a member of a protected group;

 (2) he applied for the position in question;

 (3) he was qualified for the position; and

 (4) he was rejected for the position in favor of someone not a member
   of a protected group under circumstances giving rise to an inference
   of unlawful discrimination.

<u>Alvarado v. Board of Trustees of Montgomery Community College</u>, 928 F.2d 118, 121 (4th Cir. 1991).

Gregg-Wilson has not established a prima facie case of discrimination under this scheme because he has not shown that he was qualified for the position. There is nothing in the record

as to what the qualifications were required for the Assistant Director position or what criteria were used.

In order to establish a prima facie case of discrimination relating to his termination, Gregg-Wilson must prove:

> (1)    he is a member of a protected class;
>
> (2)    he was terminated;
>
> (3)    at the time of termination he was meeting his employer's legitimate expectations for his position; and
>
> (4)    he was replaced by a similarly qualified individual from outside the protected class.

King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003), cert. denied, 540 U.S. 1073 (2003).

Gregg-Wilson has not established a prima facie case because he has not shown that he was meeting his employer's legitimate expectations or that he was replaced by someone from outside the protected class.

The undersigned concludes that Roveri and Liddell are entitled to summary judgment on Gregg-Wilson's disparate treatment claims.

> B.    Conspiracy

Roveri and Liddell argue that "(i)t is well settled case law that there can be no conspiracy, for purpose of civil rights conspiracy statutes, between or among the corporation and its agents or employees…Gregg-Wilson has alleged a civil conspiracy among either employees or agents of the Center.  Thus, his claim that a conspiracy could arise from intra-corporate communications is contrary to well-settled law." (Def. Mem., p. 13).  Gregg-Wilson has not responded to this argument.

13

In Buschi v. Kirven, 775 F.2d 1240 (4th Cir. 1985), ex-employees of a state operated mental hospital in Virginia sued twenty-five state officials (including the Governor) under § 1985(3). The Court held that the intra-corporate conspiracy doctrine applied to civil rights actions involving public officials. The concept is that a corporation cannot conspire with itself and, therefore, has immunity under § 1985(3). The Court further held that the immunity is not destroyed because the defendants are sued individually. In this case, Roveri, Liddell, and the other defendants are all employed by SCCC or are agents of SCCC. The undersigned concludes that Gregg-Wilson's § 1985(3) claim fails based on Buschi.

C.    Constitutional Claims

Roveri and Liddell argue that they are entitled to summary judgment on Gregg-Wilson's claims that his First Amendment free speech and his Fifth and Fourteenth Amendment due process rights were violated.[8]    Gregg-Wilson has not responded to these arguments.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

---

[8]Defendants appear to believe that Gregg-Wilson's disparate treatment claims, discussed above cannot be brought under § 1983. If so they are wrong. Such claims are generally brought under § 1983 as violations of the Fourteenth Amendment. Keller v. Prince George's County, 827 F.2d 952 (4th Cir. 1987).

Under § 1983, a plaintiff must meet three requirements to bring suit in federal court. He must show that he was deprived of a right guaranteed by the Constitution or laws of the United States, by a "person," who was acting "under color of" state law.

        1.    First Amendment

Citizens do not forfeit all their First Amendment rights when they become public employees. Connick v. Myers, 461 U.S. 138 (1983) and Pickering v. Board of Education (1968). "(A) State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378. 383 (1987). Whether a restriction imposed by an employer on a public employee's speech violates the First Amendment requires a balance between the employee's interest, as a citizen, in speaking on matters of public concern and the employer's interest in delivering its services to the public. Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000).

The primary issue is whether the speech in question was that of a private citizen commenting on a matter of public concern. If this is shown to be the case, the Court must then balance the employee's interest in First Amendment expression against the State's interest in maintaining proper operation of its workplace. Pickering, 391 U.S. at 568. The Court must examine the content, context, and form of the speech at issue in light of the entire record to determine whether the speech involves a matter of public concern. Urofsky, 216 F.3d at 406. Generally, speech that involves social, political, or other issues of interest to the community constitutes a matter of public concern. Id. It is recognized that speech by public employees made in the course of their job duties will frequently involve matters of public concern without giving

those employees a First Amendment right to dictate to the employer how they will perform their job. Id.

To prevail on a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in protected speech on a matter of public concern; (2) his interest in First Amendment expression outweighs his employer's interest in efficient operation of the workplace; (3) he was deprived of some valuable benefit; and (4) a causal relationship exists between his protected speech on matters of public concern and the loss of the benefit. Huang v. Board of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990).

Although Gregg-Wilson has not made it clear, the speech which he claims is protected appears to include his letter to the Board dated July 27, 2004; his staff meeting comments on September 1, 2004; his comments to the Board on September 14, 2004; and his statements in the press. The letter to the Board of July 27, 2004, is part of the record as it is contained verbatim in the complaint. At the beginning of the letter, Gregg-Wilson states it is his purpose "to formally document, notarize, challenge and resolve the social, political, and qualitative legal merits of Mr. John Roveri's hiring as Director of the Sumter County Career Center when as qualified or more qualified minority individuals were not given the chance to be interviewed." Gregg-Wilson then discussed what he believed were discriminatory practices in not renewing the contract of Roveri's predecessor (an African-American) and hiring Roveri and Liddell. He linked the action of the Board to the 9/11 tragedy, the Civil Rights movement, and a U.S. Justice Department Report which showed "racially polarized voting in Sumter County." Gregg-Wilson concluded his letter by saying, "(t)he manifestations of the insidious racial divide, pernicious polarization and

16

abhorrent tactics, which threaten civil unrest, loss of liberty, livelihood, and even lives of minority and other citizens cannot be ignored."

Thus, the undersigned concludes that Gregg-Wilson's speech concerned matters of public interest, race relations, and discrimination in Sumter County including racially discriminatory practices at SCCC. Roveri and Liddell attempt to limit Gregg-Wilson's First Amendment claim to the disruptive behavior he exhibited at the staff meeting on September 1, 2004. (Def. Mem., pp. 13-14). They cite his explanation of those comments given at his hearing before the South Carolina Employment Commission (Def. Mem., Ex. 8, p. 68). This argument would have some merit if it were the only speech involved. Further, Gregg-Wilson's speech outweighs defendants' interest in efficient operation of the workplace. Again, Roveri and Liddell's attempt to limit Gregg-Wilson's speech to the staff meeting disruption is incomplete. There is no question that Gregg-Wilson was deprived of a benefit as he was terminated. In the light most favorable to Gregg-Wilson, he would not have been terminated but for his speech.

Thus, the undersigned concludes that Roveri and Liddell are not entitled to summary judgment on Gregg-Wilson's First Amendment claim.

2.    Due Process

Roveri and Liddell characterize Gregg-Wilson's due process claim as an alleged violation of procedural due process and argue that they are entitled to summary judgment because Gregg-Wilson did not take advantage of his due process protections because he did not seek review from the Board as he was advised. Gregg-Wilson has not objected to this characterization or responded to this argument.

17

The Due Process Clause states that a State may not "deprive any person of life, liberty or property, without due process of law." In its simplest form, the Due Process Clause requires the State to provide notice and an opportunity to be heard. <u>Morris v. City of Danville</u>, 744 F.2d 1041 (4th Cir. 1984). Assuming Gregg-Wilson had a property interest in continued employment, he was afforded due process. Roveri's termination letter of November 4, 2004, stated the reasons for termination and advised him he could appeal to the Board. Gregg-Wilson chose not to go before the Board. Thus, the undersigned concludes that no procedural due process violation occurred.

> D.    Rule 41(b) Dismissal

Last, Roveri and Liddell assert that this case should be dismissed pursuant to Fed. R. Civ. P. 41(b) because Gregg-Wilson has failed to prosecute the action. Specifically, they argue that Gregg-Wilson failed to comply with the Court's order requiring him to respond to their interrogatories and document production requests and failed to appear for his deposition.

Rule 41(b) states:

> Involuntary Dismissal: Effect Thereof. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

The undersigned cannot conclude that Gregg-Wilson has neglected this case or been inactive. The sole basis, if any, would be his failure to follow the Court's order compelling discovery. Given the latitude afforded pro se litigants in this Court, the undersigned cannot recommend dismissal for this failure.

18

II.     Motions to Dismiss

The remaining defendants (all those except Roveri and Liddell) have filed motions to dismiss pursuant to Rules 12(b)(1) and 12(b)(6).  Gregg-Wilson has not responded to the arguments raised by these motions.[9]

In general, a motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Hirshon v. King & Spaulding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989).  In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff.  Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130 (1993), cert. denied, 510 U.S. 1197 (1994); see also Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994), cert. denied, 514 U.S. 1107 (1995).

 A pro se complaint must be read liberally, and such persons are not held to the strict pleading requirements otherwise required of attorneys.  Estelle v. Gamble, 429 U.S. 97, 106-07 (1976); Haines, supra.  See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1978), cert. denied, 441 U.S. 913 (1979).  When, however, it appears to the court that the plaintiff has totally failed to state a claim which would entitle him to relief, the defendants are entitled to have their motion to dismiss granted.  Fed. R. Civ. P. 12(b)(6).

---

[9]Gregg-Wilson did file a response to the motions to dismiss which does not discuss the issues raised but which seeks sanctions pursuant to Rule 11 against Boykin for filing the motions. Apparently Gregg-Wilson adopted a strategy to stagger service of the summons and complaint on defendants.  Boykin filed a motion to dismiss on behalf of the Board before some of the individual members were served.  Gregg-Wilson believes Boykin should be sanctioned for filing the motions. The undersigned recommends that Gregg-Wilson's request for sanctions be denied.

As noted above, the undersigned assumes that the defendants are sued in both their official and individual capacities.  The arguments offered by these defendants in their memoranda fail to clearly recognize this distinction.

A.    Eleventh Amendment Immunity

The members of the Board appear to argue that they are entitled to Eleventh Amendment immunity insofar as they are sued in their official capacities.  Defendants have moved to dismiss plaintiff's § 1981, § 1983, and pendent state law claims against the Board of Trustees as parties because they are immune from suit under the Eleventh Amendment to the United States Constitution.  The Eleventh Amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

Although by its terms the amendment does not bar suits against a state by citizens of that state, the Supreme Court has consistently construed the Eleventh Amendment to bar not only suits against a state brought by citizens of another state, but also suits against a state brought by its own citizens.  Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 98 (1984), citing Hans v. Louisiana, 134 U.S. 1 (1890); accord, Edelman v. Jordan, 415 U.S. 651, 662-63 (1974), and cases cited.  The immunity from suit conferred by the Eleventh Amendment extends both to suits against the state itself and to suits against state agencies.  Pennhurst, supra, at 100; Alabama v. Pugh, 438 U.S. 781 (1978); Jensen v. Conrad, 570 F. Supp. 91, 96-97 (D.S.C. 1983), aff'd 747 F.2d 185 cert. denied 470 U.S. 1052(1985); Coffin v. South Carolina Department of Social Services, 562 F. Supp. 579, 584 (D.S.C. 1983); United States v. State of South Carolina, 445 F.

Supp. 1094, 1100 (D.S.C. 1977) (3-judge court), aff'd 434 U.S. 1026 (1977).  Further, the immunity applies alike to claims for legal and equitable relief.  Pennhurst, supra.

A state's immunity from suit in federal court at the hands of its own citizens can be overcome only if the state waives its immunity and consents to suit or if Congress abrogates the immunity in legislation enacted pursuant to its power to enforce the Fourteenth Amendment "by appropriate legislation."  U.S. Constitution, amend. XIV, § 5.  Pennhurst, supra at 99.  Waiver of Eleventh Amendment immunity will be found only where the state has "unequivocally expressed" its consent to be sued in federal court.  Id.; accord Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985).  Likewise, abrogation of Eleventh Amendment immunity by Congress will be found only in those instances where there is "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" Pennhurst, supra, quoting Quern v. Jordan, 440 U.S. 332, 342 (1979).  Furthermore, this "unequivocal expression of the congressional intent" must be found "in unmistakable language in the statute itself."  Atascadero, 473 U.S. at 243.  As the court explained in Atascadero, "[A] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment.  When Congress chooses to subject the states to federal jurisdiction, it must do so specifically."  473 U.S. at 246 (citations omitted).

Not only has the State of South Carolina failed to consent to this suit, the General Assembly of South Carolina has unequivocally expressed its intent that the State and its agencies not be subject to suit in federal court.  The South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 et seq., makes state agencies subject to suit in state court under specified circumstances, but specifically provides:

> Nothing in this chapter is [to be] construed as a waiver of the state's. . .immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States. . .

Section 15-78-20(e), id.

It is settled that a state may, as South Carolina has done, consent to suit in its own courts without thereby waiving its Eleventh Amendment immunity from suit in federal court.  Florida Department of Health v. Florida Nursing Home Ass'n., 450 U.S. 147, 150 (1984); Atascadero State Hospital v. Scanlon, 473 U.S. at 241.   As the court explained in Atascadero:

> '[A] State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued.'  Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court.

Atascadero, supra, quoting Pennhurst, supra, (emphasis original).  Section 15-78-20(e) makes it apparent that the State of South Carolina has not consented to be sued in federal court.  Bellamy v. Borders, 727 F. Supp 247, 250 (D.S.C. 1989); Gulledge v. Smart, 691 F. Supp 947, 955 n.7 (D.S.C.), aff'd 878 F.2d 379 (4th Cir. 1988).

Congress has overridden the Eleventh Amendment immunity through its enactment of Title VII, the Equal Pay Act and the ADEA.  Fitzpatrick v. Bitzer, 427 U.S. 445 (1976) (Title VII); Usery v. Charleston County School District, 558 F.2d 1169 (4th Cir. 1977) (EPA); Arritt v. Grissell, 567 F.2d 1267, 1271 (4th Cir. 1977) (ADEA).  However, the Eleventh Amendment absolutely bars a federal court from entertaining pendent state claims against an unconsenting state.  Pennhurst, supra at 119-23 (1984) (court-made doctrine of pendent jurisdiction does not override Eleventh Amendment immunity).   Accord, Coffin v. South Carolina Department of Social Services, 562 F. Supp. 579 (D.S.C. 1983).

Moreover, Congress has not overridden the state's immunity from suit under either 42 U.S.C. § 1981 or § 1983.  Quern v. Jordan, 440 U.S. 332 (1979) (§ 1983); Rucker v. Board of Higher Education, 669 F.2d 1179, 1184 (7th cir. 1982); Sessions v. Rusk State Hospital, 648 F.2d 1066, 1069 (5th Cir. 1981); Foulks v. Ohio Department of Rehabilitation and Correction, 713 F.2d 1229 (6th Cir. 1983); Culler v. South Carolina Department of Social Services, 33 F.E.P. Cases 1590, 1593 (D.S.C. 1984); Wilson v. University of Virginia, 663 F. Supp. 1089 (W.D.Va. 1987) (§ 1981).  A state or its alter ego is not even defined as a "person" within the meaning of § 1983.  Will v, Michigan Department of State Police, 491 U.S. 58 (1989).

Generally an action is against the state and, therefore, barred by the Eleventh Amendment, if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act."  Dugan v. Rank, 372 U.S. 609 (1963); Artist v. Virginia International Terminals, Inc., 679 F. Supp. 587 (E.D.Va. 1988).  The courts traditionally look at the following facts in making this determination:

> (1) [W]hether and to what extent any judgment will be payable from the state treasury; (2) the extent of funding provided to the institution by the state; (3) the extent of the state's control in appointing the governing body of the institution; (4) the degree of the institution's autonomy over its operations; (5) whether the institution is separately incorporated; (6) whether it has the power to sue and be sued and to enter into contracts; (7) whether its property is immune from state taxation; and (8) whether the institution's function is governmental or proprietary.

Jacobs v. College of William and Mary, 495 F. Supp. 183 (E.D.Va. 1980), aff'd, 661 F.2d 922 (4th Cir. 1981), cert. denied, 454 U.S. 1033 (1981); Perez v. Rodriguez Ban, 575 F.2d 21 (lst Cir. 1978).

The issues of the responsibility of the State of South Carolina for public education is of some current interest as a number of local school districts have sued the State on the basis of constitutionally inadequate funding. As the undersigned understands the position of the State in that litigation, it is the primary responsibility of local districts to finance education for its children. The position of the Board in this case appears to be contrary to the State's position. Defendant's citation of various state statutes involving regulation of public schools is unavailing. Local governing bodies such as counties, municipal corporations, and school boards are "persons" that can be sued directly under § 1983 for monetary, injunctive or declaratory relief when alleged unconstitutional action executes governmental policy or custom. Defendants have cited no case in which local school districts or their trustees in South Carolina have been granted Eleventh Amendment immunity.

        B.     "Persons"

As noted above, § 1983 allows claims against "persons" who deprive another of a constitutional right under color of state law. Defendants argue correctly that the State and its agencies are not "persons" within the meaning of § 1983 citing <u>Will v. Michigan Department of State Police</u>, 491 U.S. 58 (1983). Defendants then repeat their argument that the "Career Center is the 'alter ego' of the State" which was rejected by the undersigned in the above discussion of Eleventh Amendment immunity. This argument is similarly rejected.

        C.     Official Policy or Custom

Defendants argue that Gregg-Wilson's claims against the Career Center should be dismissed because he has not plead or proven that he was deprived "of a federally protected right through an official policy, practice or custom," citing <u>Monell v. Department of</u>

24

<u>Social Serv.</u>, 436 U.S. 658 (1978) (Def. Mem., p. 7).  Since the Career Center is not named as a party, the undersigned assumes that the members of the Board argue that they cannot be held liable in their official capacities.  Gregg-Wilson has not responded to this argument.

As noted earlier, the Board has not shown that it is an arm of the State of South Carolina entitled to Eleventh Amendment immunity.  They are local government officials who may be sued in their official capacities.  However, they cannot be sued under a theory of respondeat superior and Gregg-Wilson must show that the alleged constitutional deprivation arose from the local government's policy or custom.  <u>Id</u>.  Any theory to impose vicarious liability on local government and its officials must require: (1) identifying a specific policy or custom; (2) fairly attributing policy or fault for its creation to the local entity; and (3) an affirmative link between the specified policy or custom and the alleged violation.  <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1389 (4th Cir. 1987), <u>cert.</u> <u>denied</u>, 484 U.S. 1027 (1988).

Gregg-Wilson has not alleged or identified a specific policy or custom which led to his alleged constitutional violations.  Therefore, the motion to dismiss the members of the Board in their official capacities should be granted.

D.     Failure to State a First Amendment Claim

These defendants argue that Gregg-Wilson's claim against them for a violation of his First Amendment right should be dismissed pursuant to Rule 12(b)(6) because the allegations in the Complaint are insufficient to state a claim.  They argue that Gregg-Wilson has failed to identify the speech in question.  Gregg-Wilson has not responded to these arguments. There is no heightened pleading standard in this case.  <u>Trulock v. Freeh</u>, 275 F.3d 391, 405 (4th Cir. 2001), <u>cert.</u> <u>denied</u>, 537 U.S. 1045 (2002).  Rule 8(a) requires only notice pleading, i.e., a

"short and plain" statement of the claim. Based on the discussion above with respect to the motion for summary judgment on Gregg-Wilson's First Amendment claim, the undersigned finds the pleadings sufficient.

E.     Qualified Immunity

Like Roveri and Liddell, the members of the Board construe Gregg-Wilson's First Amendment claim as his only claim brought pursuant to § 1983. They argue that they are entitled to qualified immunity on that claim. Gregg-Wilson has not responded to these arguments.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Since the doctrine entitles a defendant to "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), courts are instructed to resolve the issue at the earliest stage of litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991). Summary judgment is viewed as an opportune stage to resolve issues of qualified immunity since "factual determinations respecting disputed aspects of [a defendant's] conduct" frequently need to be developed. Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003) quoting Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). However, resolving such issues "does not mean…that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense, important as may be its early establishment." Pritchett, 973 F.2d at 313.

In <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001),[10] the Supreme Court set out the analysis courts must utilize:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. <u>Siegert v. Gilley</u>, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

The facts, as discussed above in connection with the motion for summary judgment of Roveri and Liddell, in the light most favorable to Gregg-Wilson show that his First Amendment rights were violated. It can hardly be argued that the right to be free from retaliation for protected expression was not clearly established in 2004. Therefore, the motion to dismiss on the basis of qualified immunity should be denied.

---

[10]This case involved an allegation of excessive force during an arrest.

F.     §§ 1981 and 1985(3)

The members of the Board assert that they are entitled to dismissal of Gregg-Wilson's claims for failure to promote, termination, and conspiracy claim. Gregg-Wilson has not responded to these arguments. The undersigned declines to address these arguments, but recommends that summary judgment be granted to the members of the Board sua sponte based on the discussion above with respect to the motion for summary judgment of Roveri and Liddell.

G.     Jackson, Culick and Dyson

Jackson, Culick and Dyson were Gregg-Wilson's peers, instructors at SCCC. They assert that they should be dismissed as defendants pursuant to Rule 12(b)(6) because Gregg-Wilson has failed to allege conduct actionable under state of federal law. Gregg-Wilson has not responded to these arguments.

Review of the complaint shows that Gregg-Wilson alleges that Jackson, Culick and Dyson:

1.     Were part of the conspiracy to deprive Gregg-Wilson of his constitutional rights (Complaint, ¶ 5);

2.     Were not required to abide by the dress code and other policies (Complaint, ¶ 20);

3.     Were friendly with Roveri and Liddell (Complaint, ¶ 23);

4.     Criticized Gregg-Wilson for imposition of the dress code (Complaint, ¶ 40); and

5.     Were together when Jackson assaulted Gregg-Wilson (Complaint, ¶ 43).

There is no allegation that Jackson, Culick or Dyson had authority or were involved in the decision making process which led to Gregg-Wilson's suspension and termination. Gregg-Wilson's conspiracy claim fails based on the above discussion with respect to the motion for

28

summary judgment of Roveri and Liddell.  The undersigned finds that the only viable claim against any of these three defendants is a pendent claim for assault and battery against Jackson.

> H.    Boykin

> Boykin moves for dismissal under Rule 12(b)(6).  He asserts that the only claim alleged against him is a pendent claim for false imprisonment and that he is immune from suit.  Gregg-Wilson responded to these arguments by filing a motion for sanctions against Boykin.

The elements of a claim for false imprisonment are: (1) the defendant restrained the plaintiff; (2) the restraint was intentional; and (3) the restraint was unlawful.  Thomas v. Colonial Stores, 236 S.C. 95, 113 S.E.2d 337 (1960).  The alleged false imprisonment took place when Boykin attempted to interview Gregg-Wilson after the Board decided to investigate the allegations made by Gregg-Wilson in his appearance before the Board on September 14, 2004.  The allegations are contained in paragraphs 35-38 of the Complaint.  Based on a review of the allegations, Gregg-Wilson asserts that he was forced to meet with Boykin "(u)nder threat for insubordination" (Complaint, ¶ 37).  This threat of insubordination could not have come from Boykin as he had no authority to discipline Gregg-Wilson.  According to Gregg-Wilson, Boykin insisted that he interview Gregg-Wilson before he went to lunch.  Id.  Based on these allegations, the undersigned finds that the allegation that Boykin falsely imprisoned Gregg-Wilson is insufficient because Boykin could not be found to have restrained Gregg-Wilson.  He was free to go to lunch, but he may have been disciplined by others for failing to cooperate in the investigation launched as a result of his accusations.

III.    Gregg-Wilson's Motions (Doc. Nos. 10, 39, and 43)

Gregg-Wilson seeks summary judgment or default against all defendants.  These motions are totally devoid of any analysis or identification of Gregg-Wilson's claims.  They simply attack the defendants and their conduct in this action.  For example, in his motion filed August 2, 2005, Gregg-Wilson asserts that he is entitled to summary judgment "on the grounds that Defendants and their Counsel(s) based primarily upon their race, wealth, power, influence, gross deliberate misuse and abuse of authority and privileges granted by the State and Conspiracy on multiple levels, have willfully, wantonly, and perniciously engaged in numerous deliberately contumacious and egregious acts of blatant pernicious lies, attempts to deceive, violate, bring into ill repute the rights and privileges of Plaintiff and countless other Minorities, the reputation of this Court, its Jurist the State and the Nation."  Gregg-Wilson is not entitled to summary judgment on these or any other grounds.  Further, since all defendants have either filed an Answer or Motion to Dismiss, Gregg-Wilson is not entitled to default.

**Conclusion**

Based on a review of the record, it is recommended:

1.    That plaintiff's dispositive motions (Doc. Nos. 10, 39, and 43) be denied;

2.    That plaintiff's motion for sanctions (Doc. No. 9) be denied;

3.    That the motion for summary judgment of Roveri and Liddell (Doc. No. 38) be denied with respect to plaintiff's § 1983 First Amendment claim and be granted in all respects;

4.    That the motion of the members of the Board of Trustees to dismiss on the grounds of Eleventh Amendment immunity (Doc. No. 13) be denied;

5.      That the motion of the Board of Trustees to dismiss on the grounds that they are not "persons" amenable to suit under § 1983 (Doc. No. 13) be denied;

6.      That the motion of the members of the Board of Trustees to dismiss on the grounds that in their official capacities their actions were not taken pursuant to official policy or custom (Doc. No. 13) be granted;

7.      That the motion to dismiss of the members of the Board of Trustees with respect to plaintiff's First Amendment claim (Doc. No. 13) be denied;

8.      That the motion to dismiss plaintiff's First Amendment claim as to the members of the Board of Trustees in their individual capacities on the basis of qualified immunity (Doc. No. 13)  be denied;

9.      That the Court sua sponte grant summary judgment to the members of the Board of Trustees on plaintiff's disparate treatment and conspiracy claims;

10.      That the motion to dismiss of defendants Jackson, Culick, and Dyson (Doc. No. 13) be denied as to the claim of assault and battery against Jackson and granted in all other respects; and

11.      That the motion to dismiss of Boykin (Doc. No. 4) be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

September 1, 2005
Columbia, South Carolina

**The parties' attention is directed to the important information on the attached notice.**

## Notice of Right to File Objections to Magistrate Judge's Report and Recommendation & The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of its filing. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. Based thereon, this Report and Recommendation, any objections thereto, and the case file will be delivered to a United States District Judge fourteen (14) days after this Report and Recommendation is filed. Advance Coating Technology, Inc. v. LEP Chemical, Ltd., 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992). A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. See Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

During the ten-day period, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991). See also Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, *supra*, the Court stated that general, non-specific objections are *not* sufficient:

A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockner v. Faulkner, 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

See also Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd. Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections. See Wright, supra,; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201